George Frankenthaler, S.
The writing which is offered for probate as the decedent’s last will is inscribed upon a brown paper envelope the dimensions of which are 11 inches by 6 inches. The flap of the envelope, extending along its greater dimension, bears the printed name and address of a safe deposit company. The body of the purported will consists of a date and a single sentence and reads: ‘ ‘ Aug. 30, 1947 Having given half of what I own to my daughter Regnia I leave everything I may accumulate in the future to y [sic]my sister Georgia Iverson, if living, if not living then to my cousin Pearl Fagan.”
The quoted matter is typewritten on the extreme right side of the face of the envelope and parallel to its narrow dimension. The typing is single spaced and occupies an area approximately six inches by one inch at the very end of the envelope. The purported signature of the decedent and his address are inscribed near the left side of the envelope, parallel to its longer dimension and at right angles to the typewritten matter. The handwriting begins at a point nine inches removed from the typewritten portion and reads: ‘‘ W. G. Parkman 1293 — 2d Ave N. Y. C. c/o Mrs. O Malley.” Between this writing and the typewritten matter and also parallel to the long side of the envelope and at right angles to the typewritten text are the name and address of a person designated as “ sister ” and below such writing are the name and address of a person designated as “ cousin ”. The persons so designated are those named as legatees in the typewritten sentence. The names and addresses of the decedent and the two other persons are written in pencil and all appear to be in the same hand. These penciled writings occupy the greater portion of the face of the envelope *1016 extending over nine inches of its length and they would appear to have been the first writings on the envelope and placed there without contemplation that other matter would be written on the envelope. At the extreme lower left corner of the envelope, below and parallel to the purported signature and address of the decedent, are the words and mark ‘ ‘ Witness by X ” followed by a signature and in order below that signature are two more signatures. The words indicating the place for attestation and the three signatures of the witnesses are written in ink and are within an area four and one-half inches by one and one-half inches.
Unexplained, this paper is a most unusual form of will. Not merely curiosity but suspicion and disbelief are aroused as to its genuineness because of many things, particularly as to the choice of a brown paper envelope for so solemn an instrument as a will, as to the reason for the signatures of the decedent and the attesting witnesses appearing at right angles to the dispositive portion rather than below and parallel to such portion, as to the relative areas occupied by the dispositive portion and the signatures of witnesses contrasted with the space occupied by the testator’s signature and the identification of the legatees and also as to the significance of the penciled address of the decedent and the penciled names and addresses of the legatees. The appearance of the envelope gives the firm impression that the cramped typewritten dispositive text and the crowded signatures of the witnesses were squeezed into the only spaces left available around the penciled writings which were the first writings on the enevelope. The decedent’s address, a street number and the additional information “ c/o Mrs. 0 Malley ”, is a form that would be appropriately inscribed upon an envelope to designate ownership of its contents rather than a method of identifying a testator. It also is most peculiar that a testator having named his legatees as his sister Georgia Iverson and his cousin Pearl Fagan in the body of his will, would feel a need to repeat their names and relationship again alongside his signature. It seems much more reasonable that such information was written on an envelope in relation to its contents at a time when testamentary language was not on the paper.
The sister of the decedent predeceased him and the proponent of the purported will is the cousin whose name twice appears on the envelope. The typewriting is said to have been done by the proponent’s sister Beatrice who in August, 1947 was employed as a cashier at the University of New Hampshire and had been in the employ of that university for many years. At *1017 the date of the trial Beatrice was dead. The typing is said to have been done in the kitchen of the proponent’s home on a portable typewriter which Beatrice had been using in doing some work for the university. Adjoining the kitchen was an office which the proponent used in conducting a rooming house business. If Beatrice had occasion to type a will, some stationery was probably at hand in the kitchen in connection with her use of the typewriter and it is a fair assumption that writing paper was available in the adjoining office but the explanation offered for the use of the brown envelope is that the decedent removed this creased envelope from his pocket and directed its use. It was further testified that the portable typewriter would not accommodate the full length of the envelope and rather than fold it the typing was done across its narrow width. It was also stated that Beatrice indicated the place for the signatures of the witnesses by writing the words “ Witness by ” and marking the place with an X. It may well be asked why she failed to indicate with her typewriter a place for the decedent’s signature and places for the signatures of witnesses and it is most unfortunate that Beatrice is not available to explain how an experienced clerical worker could have produced this unfinished and unworkmanlike piece of writing.
A number of instruments were introduced in evidence to establish that the decedent signed his name on formal documents as William Gordon Parkman or as William G. Parkman and there is before the court no document, other than the propounded paper, signed W. G. Parkman. Although not conclusive, this is at least an indication that the inscription on the envelope was a notation of ownership rather than a formal signature. The fact that the decedent chose to sign in pencil while the witnesses signed in ink would not necessarily cast suspicion upon the validity of a will but here the use of pencil presents another unusual aspect of a strange picture.
The decedent under the name of William Gordon Parkman had been a lessee of a safe deposit box for some years prior to the date appearing on the propounded paper. In 1954 he deputized the proponent to have access to that box. Four days after the decedent’s death the proponent removed the contents of this box without having procured a court order for such purpose and without the notice to the tax authorities that is required by section 249-t of the Tax Law. The propounded paper was not found in the safe deposit box. Information is lacking as to what then was in the box but when, subsequent to the institution of this proceeding, the box was opened in the *1018 presence of a tax representative it was empty. Whatever occasion the decedent had to rent a safe deposit box for 10 years, proponent herself asserts that he did not use it as the repository of the paper now offered as his will.
The testimony of the three subscribing witnesses was that the envelope upon which the propounded paper is inscribed was produced by the decedent on August 30, 1947, the typewritten matter was written thereon at his direction, thereafter he declared to the witnesses that the instrument was his will, he wrote the names and addresses of his sister and his cousin and signed the will in the presence of the witnesses and requested them to subscribe it as witnesses, which they did in his presence. The testimony meets the statutory requirements as to the execution of a will, and if believed, would require that the propounded paper be admitted to probate. One of the witnesses is a brother of the proponent. The other witnesses are a married couple who have very close relationship with the proponent. The court rejects the testimony of these witnesses as incredible.
The testimony on behalf of the proponent that the words “ Witness by ” were written by proponent’s sister Beatrice is of great significance. Beatrice predeceased the testator and her writing of these words prior to the attestation of the paper by the witnesses not only would tend to establish that the paper was signed by the witnesses in the testator’s lifetime but would support the testimony of the subscribing witnesses as to the manner of the paper’s execution. Subsequent to the trial, at the suggestion of the court, the parties, by stipulation, submitted specimens of the handwritings of Beatrice and of the proponent. The parties have been given an opportunity to offer testimony of handwriting experts and they have not chosen to do so but the examples of the handwriting of Beatrice clearly disclose that she did not write the words “Witness by” and testimony that she did write these words was false. This fact alone is sufficient to discredit the testimony of the subscribing witnesses. The court is bound to inquire particularly into all the facts and circumstances surrounding every instrument offered for probate as a will and must be satisfied that at the testator’s death the instrument was an extant validly executed document before admitting it to probate (Surrogate’s Ct. Act, § 144; Matter of Schultz, 180 Misc. 1023, affd. 268 App. Div. 966; Matter of Frazell, 174 Misc. 142). The court cannot close its eyes to the obvious. It does not accept the propounded paper as a testamentary instrument. The physical appearance of the paper belies that it ever was intended as a will or that it *1019 was executed in the manner testified to by the witnesses. The testimony as to the manner of the paper’s execution has been disproved by the handwriting specimens and this testimony is rejected.
Proof supporting the objections charging fraud and undue influence was not offered but these issues do not exist in respect of the propounded paper which never was executed as a will.
The contestant has asserted that the requirements of section 21 of the Decedent Estate Law have not been met for the reason that the propounded paper was not subscribed by the testator at its end. By reason of the rejection of the paper as a will this issue is academic but nevertheless will be ruled upon. The contention that the paper was not signed at its end relies upon the remoteness of the testator’s signature from the typewritten text and particularly the possibility — even probability ■— that the names and addresses of the purported legatees were inscribed on the paper by the testator after he signed his name. There was testimony that the names and addresses of the alleged legatees were placed on the paper prior to the signature of the decedent and if that were the fact a question of signing at the end would not arise. If the writing of these names and the signature was in reverse order, and the paper had been otherwise validly executed as a will, it would not be defective because not signed at the end. In Matter of Mackris (124 N. Y. S. 2d 891) this court concluded on the basis of the authorities then cited that the purpose of the statutory requirement that a testator sign his will at its end is to prevent fraudulent additions to a will either before or after its execution, that the end of a will is that place on the instrument at which provisions relating to the disposition and administration of the estate terminate and, consequently, that the appearance of immaterial information or directions following the signature of the testator do not affect the validity of the paper’s execution. In short, the statute is complied with when subscription of the paper is not followed by matter either essential to its validity or of such importance to the testator’s intention regarding the administration of his estate as to form an integral part of his will (Matter of Winters, 277 App. Div. 24, affd. 302 N. Y. 666). The writing of the names and addresses of the sister and the cousin subsequent to the typing of the paper and the signing of it by the decedent would be nothing more or less than double identifications of the persons named as legatees. The repetition of the names and addresses would not be essential to the validity of the paper as a will and could not be regarded as of any conse *1020 quence in the fulfillment of a testamentary intention inasmuch as the omission of this descriptive matter would not affect bequests. Were the propounded paper a will it would be regarded as signed at its end within the meaning of section 21 of the Decedent Estate Law.
Submit decree on notice denying probate to the propounded paper.